**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GEORGE RUSSELL KAYER,
*Petitioner-Appellant*,

v.

CHARLES L. RYAN, Warden, Director
of the Arizona Department of
Corrections,
*Respondent-Appellee.*

No. 09-99027

D.C. No.
2:07-cv-02120-
DGC

OPINION

Appeal from the United States District Court
for the District of Arizona
David G. Campbell, District Judge, Presiding

Argued and Submitted March 8, 2018
Pasadena, California

Filed May 13, 2019

Before: William A. Fletcher, John B. Owens,
and Michelle T. Friedland, Circuit Judges.

Opinion by Judge W. Fletcher;
Partial Concurrence and Partial Dissent by Judge Owens

# SUMMARY[*]

## Habeas Corpus / Death Penalty

The panel reversed in part and affirmed in part the district court's judgment denying Arizona state prisoner George Russell Kayer's habeas corpus petition, and remanded with directions to grant the writ with respect to Kayer's death sentence.

The panel held that the Arizona Supreme Court erred in rejecting Kayer's proffered mental-impairment mitigation evidence on the ground that the alleged impairment did not have a causal nexus to the commission of the crime. The panel held that this erroneous ruling, which was an alternative holding, was harmless because the Arizona Supreme Court's principal holding – that Kayer presented so little evidence of mental impairment that he failed to establish even the existence of any such impairment – was a reasonable determination of the facts.

The panel reversed the district court's denial of relief on Kayer's claim that he was denied his Sixth Amendment right to effective assistance of counsel due to his attorneys' inadequate mitigation investigation in preparation for his penalty phase hearing. The panel held that in failing to begin penalty-phase investigation promptly after they were appointed, Kayer's attorneys' representation fell below an objective standard of reasonableness; and that the conclusion of the state post-conviction-relief (PCR) court that Kayer's

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

attorneys provided constitutionally adequate performance was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court. The panel concluded that but for counsel's deficient performance, there is a reasonable probability Kayer's sentence would have been less than death, and that the state PCR court was unreasonable in concluding otherwise.

The panel did not need to reach the question whether the sentencing court acted properly in denying a continuance, and agreed with the district court that none of the procedurally-defaulted claims Kayer sought to revive was substantial in the sense necessary to support a finding of cause and prejudice under *Martinez v. Ryan*, 566 U.S. 1 (2012). The panel declined to certify two additional claims.

Concurring in part and dissenting in part, Judge Owens disagreed that the death sentence must be reversed because he could not say that the Arizona PCR court acted unreasonably regarding prejudice in light of the aggravating and mitigating circumstances in this case.

---

## COUNSEL

Jennifer Y. Garcia (argued) and Emma L. Smith, Assistant Federal Public Defenders; Jon M. Sands, Federal Public Defender; Office of the Federal Public Defender, Phoenix, Arizona; for Petitioner-Appellant.

John Pressley Todd (argued), Special Assistant Attorney General; Jacinda A. Lanum, Assistant Attorney General; Lacey Stover Gard, Chief Counsel; Dominic Draye, Solicitor

General; Mark Brnovich, Attorney General; Office of the Attorney General, Phoenix, Arizona; for Respondent-Appellee.

_____

**OPINION**

W. FLETCHER, Circuit Judge:

George Russell Kayer was convicted of first degree murder and sentenced to death in Arizona Superior Court in 1997. During a brief penalty-phase hearing, Kayer's counsel argued as a mitigating circumstance that Kayer suffered from mental illness and was a substance abuser, but provided very little evidence to support the argument. The judge held that Kayer had not established any mental impairment due to mental illness or substance abuse. He sentenced Kayer to death.

On direct appeal, the Arizona Supreme Court performed an independent review of Kayer's death sentence, as required under Arizona law. The Court found two statutory aggravating circumstances—a previous conviction of a "serious offense" in 1981, and "pecuniary gain" as a motivation for the murder. *State v. Kayer*, 984 P.2d 31, 41–42 (Ariz. 1999). The Court found one non-statutory mitigating circumstance—Kayer's importance in the life of his son. *Id.* at 42. After weighing the two aggravating circumstances against the one mitigating circumstance, the Arizona Supreme Court affirmed Kayer's death sentence.

As he had in the trial court, Kayer argued in the Arizona Supreme Court for a mitigating circumstance based on mental impairment due to mental illness and/or substance abuse. The

Court refused to find a mitigating circumstance based on mental impairment, as either a statutory or non-statutory mitigator. First, the Court refused to find that such impairment existed at all. In the view of the Court, the existence of such impairment was merely speculative. Second, in the alternative, the Court held that even if there had been non-speculative evidence of the existence of such impairment, Kayer had failed to establish a "causal nexus" between the alleged impairment and the murder.

In a post-conviction relief ("PCR") proceeding in Arizona Superior Court, Kayer argued that his trial counsel had provided ineffective assistance at the penalty phase. Kayer presented evidence in the PCR court that his trial counsel had performed little investigation of mitigating circumstances. He also presented extensive evidence of mental impairment due to mental illness and substance abuse which, he contended, competent counsel would have discovered and presented to the sentencing court. The PCR court denied relief, holding that Kayer's counsel had not been ineffective, and that, in any event, any deficiencies in his counsel's performance did not prejudice Kayer. The Arizona Supreme Court declined review without comment.

Kayer then sought federal habeas corpus. The district court denied relief. On appeal to us, Kayer makes two claims with which we are centrally concerned. First, Kayer claims that the Arizona Supreme Court on direct appeal violated his Eighth Amendment right to be free of cruel and unusual punishment by applying its unconstitutional "causal nexus" test to his proffered mitigating evidence of mental illness and substance abuse. *See Eddings v. Oklahoma*, 455 U.S. 104 (1982); *McKinney v. Ryan*, 813 F.3d 798 (9th Cir. 2015) (en banc). Second, Kayer claims that the Arizona Superior Court

on post-conviction review erred in holding that his Sixth Amendment right to counsel was not violated by his counsel's deficient performance at the penalty phase. *See Strickland v. Washington*, 466 U.S. 668 (1984).

For the reasons that follow, we decline to grant relief on Kayer's *Eddings* causal-nexus claim but grant relief on his *Strickland* ineffective-assistance-of-counsel claim. We reverse the judgment of the district court and remand with directions to grant the writ with respect to Kayer's sentence.

## I.  Factual and Procedural History

### A. Factual History

Lisa Kester approached a security guard at a Las Vegas hotel on December 12, 1994, to report that her boyfriend, George Russell Kayer, had killed Delbert Haas in Yavapai County, Arizona, ten days earlier. *State v. Kayer*, 984 P.2d 31, 35 (Ariz. 1999). Kester was arrested and interrogated. The following account of the events leading up to and culminating in Haas's murder is largely based on Kester's narrative at trial, as summarized by the Arizona Supreme Court on direct appeal.

On November 30, 1994, Kayer, Kester, and Haas traveled in Haas's van from Arizona to Nevada on a gambling trip. The three of them spent their first night sharing a room at a hotel in Laughlin, Nevada. Kayer told Haas that night that he had "won big" during the day using a special gambling system. Kayer knew that Haas had recently received money from an insurance settlement. He convinced Haas to lend him about $100.

The next day, Kayer lost all the money Haas had lent him. Kayer lied to Haas, telling him that he had again "won big," *id*. at 36, but that someone had stolen his money. Kester asked Kayer what he planned to do now that he was out of cash. Kester testified that Kayer replied that he would rob Haas. Kester pointed out that Haas would easily identify Kayer as the thief. According to Kester, Kayer responded, "I guess I'll just have to kill him." *Id.*

On December 2, Kayer, Kester, and Haas drove back to Arizona. Kester recounted in a pretrial interview that the three of them consumed a case of beer during the several-hour drive. Haas argued with Kayer about how Kayer would repay him. During a stop to buy snacks and use the bathroom, Kayer pulled a gun from beneath a seat in the van and put it in his pants. He asked Kester if she was "going to be all right with this." *Id*. Kester responded that she wanted Kayer to warn her before he pulled the trigger.

Kayer, who was driving, left the main highway, purporting to take a shortcut. He stopped the van by the side of a back road. Haas got out of the van and walked toward the back to urinate. Kester started to get out of the van, but Kayer stopped her, motioning to her with the gun. Through the back window of the van, Kester saw Kayer walk up behind Haas and shoot him in the head while he was urinating.

Kayer dragged Haas's body into the bushes; took Haas's wallet, watch and jewelry; got back in the van; and drove away with Kester. Kayer realized that he had forgotten to get Haas's house keys and drove back to where they had left his body. Kayer got out of the van to retrieve the keys, but returned and asked for the gun, saying that Haas did not

appear to be dead. Kayer went back to Haas's body, and Kester heard a second shot.

Kayer and Kester drove to Haas's home in Arizona and stole several items to pawn and sell at flea markets. They spent the next week pawning and selling the stolen property and gambling with the proceeds. Ten days after the murder, Kester approached a security guard in Las Vegas and reported that Kayer had killed Haas. She was taken into custody. Kayer was taken into custody soon afterwards.

Kayer and Kester were indicted for first degree murder on December 29, 1994. The State initially announced that it would seek the death penalty against both of them. In September 1995, Kester entered into a plea agreement under which the State agreed not to seek the death penalty and, further, to limit dramatically her potential sentence. Under the agreement, Kester would receive, at worst, a six-and-a-half-year prison sentence. At best, she would be sentenced to probation. In exchange, Kester agreed to testify truthfully at Kayer's trial, consistent with her previous statement to the police. Kester testified as promised. After Kayer was convicted, Kester was sentenced to three years probation.

## B. Procedural History

### 1. Trial, Conviction, and Sentencing

The jury convicted Kayer of first degree murder on March 26, 1997. Kayer's "aggravation/migitation hearing" took place on July 8, 1997. His attorneys put on five witnesses. Their testimony was finished before noon.

First, Jerry Stoller, a "detention officer" who worked in the law library of the county jail, testified that Kayer was always "very busy" when at the library, always taking "the full three hours." When asked if Kayer's "conduct has always been good," Stoller responded, "In my presence, yes."

Second, Cherie Rottau, Kayer's seventy-six-year-old mother, testified that Kayer had been generally well behaved during high school. She testified that Kayer's father had died when he was in kindergarten and that she had not remarried until after Kayer had graduated from high school. She recounted that when Kayer was a teenager, he had shot two jackrabbits at her sister's house in the country. Afterwards, "He said, 'You know, that's not right to go out there and kill things.' He said, 'I'll never kill another thing as long as I live.' And to my knowledge, he hasn't." She testified that she did not have "any concerns about him until he was older," when he was nineteen and had already graduated from high school. "I noticed a change in him. . . . [H]e would work 24 hours and then when he'd get to sleep he'd sleep a long time, . . . [W]hen he was happy he was real happy." "[W]hen he gets depressed, he just gets down at the bottom of the well, and when he's happy, . . . there's nothing he can't do when he's happy. And he does accomplish a lot." She testified that Kayer's fourteen-year-old son had been "dropped" in the delivery room, and that he had "difficulties with school and certain other developmental things." She testified that Kayer and his son were "real close" and that Kayer had been "active in trying to get . . . educational assistance" for his son.

Third, Kayer's older half-sister, Jean Hopson, testified that Kayer's father (her stepfather) had drinking and gambling problems, and that Kayer had the same problems, beginning in his early twenties. She testified, "[H]e was a

happy kid as a school kid, and I think his problems started when he was in the service, and shortly afterwards, getting married." She testified, further, that Kayer had "[h]ighs and lows." "We did have a family discussion one time, and he . . . was diagnosed, I guess, as a bipolar manic-depressive, or something like that." "I believe [he was diagnosed] at the VA hospital. At one point, he checked himself in." "He is supposed to be on lithium now, but he read up on the side effects of lithium, how it can affect your liver and different body organs, and he will not take it." "I don't really totally understand the bipolar manic-depressive. I understand it enough to know that there are ups and downs[.]"

Fourth, Mary Durand, who had just been hired as a mitigation specialist for Kayer, testified:

> In a normal mitigation case you would spend probably 100 hours at a minimum with the client, developing a rapport, learning information, taking a social history, gaining his confidence or her confidence so that you can get them to share with you things that are sometimes extraordinarily painful, sometimes things they don't want to relive, sometimes things they have buried and merely don't remember until other people start giving anecdotal evidence.

Durand testified that she had been able to interview Kayer only twice, for a total of six or seven hours.

Durand testified that although she had been able to interview some of Kayer's family members, the only documentary evidence she had been able to obtain was

Kayer's "criminal court records from his prior involvements with the law." She had not been able "to get any of the psychiatric records from any of his stays at psychiatric hospitals around the country." She "didn't get any of his school records, medical records, any of his military records." Based on the information she was able to obtain, Durand testified that there was a "family history on both sides of alcoholism"; that there was a "history of mental illness"; and that Kayer was slow to develop as a child. She testified that Kayer "was allegedly diagnosed as a manic-depressive and was having such a manic state and then such a severely depressive state while he was in the military that he was allowed to get out of his military enlistment honorably, but under medical conditions[.]"

When asked whether she had sufficient information "to give any sort of reliable opinions to the judge as far as mitigating elements," Durand responded:

> I would certainly not be qualified to give a medical opinion about a diagnosis of a psychiatric condition, and I do not feel comfortable giving an opinion about the length, breadth and depth of any other issue I have spoken to, *because I have not been able to do my investigation.* I do believe they exist. I do not know to what degree, for what length, and what duration, and how serious.

(Emphasis added.)

After Durand finished her testimony, the judge noted that sentencing was scheduled for July 15, a week later. He asked Kayer whether he wished more time for further investigation:

> Do you want more time? By asking you the question, I'm basically saying if you tell me right now that you've considered it, and you want more time, I'm prepared to give you more time. But I think you are an intelligent individual. You know what she's just testified to. . . . You got the information, you got the intelligence, you've talked to counsel, you've heard Ms. Durand. Your call.

Kayer replied that he did not want more time.

Finally, Kayer's son testified. His testimony took only eleven lines of transcript.

At sentencing on July 15, the trial judge held that the state had established two statutory aggravating circumstances—that Kayer had been previously convicted of a "serious offense" and that the murder was committed for "pecuniary gain." However, the judge refused to find as an additional aggravating circumstance that the murder was committed in "an especially heinous, cruel or depraved manner." He explained:

> The pathologist was not able to testify anything . . . as to the suffering of [the] victim in this case, so that would be the necessary finding as far as cruelty. As to heinous and depraved, that deals with your thoughts and conduct surrounding the murder and the events afterward. As I read the case law and the description, I do not find that the evidence presented rises beyond a reasonable doubt as far as proving heinous and depraved . . . .

The trial judge found that Kayer had established only one mitigating circumstance—the non-statutory mitigator that Kayer had "become an important figure in the life of his son." The judge held that he could not find mental impairment as a mitigating circumstance. He stated, "I must find it by a preponderance of the evidence. I simply cannot. It has not been presented in any way, shape or form that would rise to that level." The judge concluded that Kayer's relationship with his son did not outweigh his prior conviction and his pecuniary motive for killing Haas. He sentenced Kayer to death.

## 2. Direct Appeal

Kayer appealed to the Arizona Supreme Court. *See* Ariz. Rev. Stat. § 13-4031 (1997); *State v. Kayer*, 984 P.2d 31 (Ariz. 1999). That Court conducted an independent review of Kayer's death sentence, in accordance with Arizona law.

On direct review, the Arizona Supreme Court found the same two statutory aggravating circumstances that the trial court had found—prior conviction of a serious offense and commission of murder for pecuniary gain. It also found the same non-statutory mitigating circumstance as the trial court—Kayer's "importance in the life" of his son.

As he had to the trial court, Kayer argued to the Arizona Supreme Court that he had a mental impairment that qualified as either a statutory or a non-statutory mitigating circumstance.

First, Kayer argued that his mental impairment qualified as a statutory mitigation circumstance under Arizona Revised Statutes § 3-703(G)(1) (as it was then numbered), which

required that the "defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of [the] law [be] significantly impaired, but not so impaired as to constitute a defense to prosecution." *Kayer*, 984 P.2d at 45. Kayer argued that "his history of mental illness, including a history of suicide ideation, a history of alcoholism in his family, and his own polysubstance abuse, establishes the existence of this mitigating factor under the preponderance standard." *Id.* The Arizona Supreme Court disagreed. It held that Kayer had presented insufficient evidence to establish the existence of any mental impairment whatsoever. The Court wrote that Kayer "did not establish as threshold evidence the existence of any of these factors, let alone their influence on preventing him from conforming his conduct to the law or appreciating the wrongfulness of his conduct." *Id.* The Court also held, in the alternative, that Kayer had failed to establish a "causal nexus" between the alleged impairment and the murder.

Second, Kayer argued that his mental impairment qualified as a non-statutory mitigation circumstance. The Court held, as it had with respect to statutory mitigation, that Kayer had failed to present sufficient evidence to establish the existence of any impairment. The Court discounted Durand's tentative conclusions, writing that "Durand speculated that defendant suffered from mental difficulties." *Id.* at 46. The Court concluded, "[T]he record shows that the existence of impairment, from any source, is at best speculative." *Id*. In the alternative, the Court concluded that Kayer had failed to establish a causal nexus:

> Further, in addition to offering equivocal evidence of mental impairment, defendant offered no evidence to show the requisite

causal nexus that mental impairment affected his judgment or his actions at the time of the murder.

*Id.*

After an independent weighing of the two aggravating circumstances and the one mitigating circumstance, the Arizona Supreme Court affirmed Kayer's death sentence.

### 3. Post-Conviction Proceedings

Kayer filed a post-conviction relief ("PCR") petition in Arizona Superior Court. *See* Ariz. R. Crim. P. 32.1. In accordance with Arizona law, Kayer's trial judge presided over his PCR proceedings.

Kayer claimed that the "trial court and the Arizona Supreme Court incorrectly applied United States Supreme Court law when they required [that] mitigating factors have a 'causal nexus' to the crime," in violation of *Eddings v. Oklahoma*, 455 U.S. 104 (1982). The state responded that Kayer had procedurally defaulted his causal nexus *Eddings* claim "by not raising it in his direct appeal, or in a motion for reconsideration." The PCR court agreed, concluding that Kayer had procedurally defaulted this claim under Arizona Rule of Criminal Procedure 32.2(a)(3).

Kayer also claimed that his Sixth Amendment right to counsel was violated when his trial counsel failed to conduct a constitutionally adequate mitigation investigation. The PCR court conducted a nine-day evidentiary hearing at the end of March 2006, during which Kayer's attorneys presented witnesses and documentary evidence showing the mitigation

evidence that Kayer's trial attorneys could have uncovered had they performed a constitutionally adequate investigation. We describe this evidence in detail below. *See infra*, Section IV.

The PCR court issued a very brief written decision on May 8, 2006, rejecting Kayer's Sixth Amendment ineffective assistance claim. The court concluded that Kayer had "voluntarily prohibited his attorneys from further pursuing and presenting any possible mitigating evidence." It concluded, in the alternative, that if deficient performance under *Strickland v. Washington*, 466 U.S. 668 (1984), had been shown, "no prejudice to the defendant can be found."

The Arizona Supreme Court denied without explanation Kayer's Petition for Review of the Superior Court's denial of post-conviction relief.

### 4. Federal Habeas Petition

On December 3, 2007, Kayer filed a timely petition in federal district court for a writ of habeas corpus under 28 U.S.C. § 2254(d). The district court denied relief, and Kayer appealed to this court. We remanded to the district court to give Kayer an opportunity to establish cause and prejudice pursuant to *Martinez v. Ryan*, 566 U.S. 1 (2012), for his counsel's procedural default in state court. The district court again denied relief. This appeal followed.

### II. Standard of Review

"We review the district court's denial of [a] § 2254 habeas corpus petition de novo." *Deck v. Jenkins*, 814 F.3d 954, 977 (9th Cir. 2014).

Kayer's habeas petition is subject to the Antiterrorism and Effective Death Penalty Act ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320, 322–23 (1997). Under AEDPA, "[w]e review the last reasoned state court opinion." *Musladin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009). In this case, that opinion is the written order of the state PCR court.

AEDPA provides that where a state court has adjudicated a claim on the merits, relief may be granted only if the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or if the state court decision rests on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2). "[A] state-court decision is contrary to [Supreme Court] precedent if the state court arrives at a conclusion opposite to that reached by [the] Court on a question of law . . . [or] if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at [the opposite] result . . . ." *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state court unreasonably applies Supreme Court precedent "if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Mann v. Ryan*, 828 F.3d 1143, 1151 (9th Cir. 2016) (en banc) (alteration omitted) (quoting *Williams*, 529 U.S. at 413). "[W]e may only hold that a state court's decision was based on an unreasonable determination of the facts if 'we are convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.'" *Murray v. Schriro*, 745 F.3d 984, 999 (9th Cir. 2014) (quoting *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004)). Neither of

these standards "require[s] citation of [Supreme Court] cases . . . [or] even require[s] awareness of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam).

We review de novo an exhausted claim that a state court has failed to decide on the merits. *See Pirtle v. Mogan*, 313 F.3d 1160, 1167 (9th Cir. 2002). We may not grant habeas relief if an error in state court was harmless. *See Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993).

## III.  Causal Nexus and Ineffective Assistance of Counsel

There are four certified questions before us. The first two are the most important. First, Kayer contends that the trial court and the Arizona Supreme Court on direct appeal violated *Eddings v. Oklahoma*, 455 U.S. 104 (1982), by applying an unconstitutional "causal nexus" test under which a circumstance is not mitigating unless causally connected to the commission of the crime. *Eddings* held under the Eighth Amendment that a sentencer may not "refuse to consider, *as a matter of law*, any relevant mitigating evidence." *Id.* at 113 (emphasis in original). Second, Kayer contends that the Arizona PCR court erred in holding that his right to counsel under the Sixth Amendment under *Strickland* had not been violated. We consider these two questions in turn.

### A.  Causal Nexus

Kayer contends that the trial court and the Arizona Supreme Court violated *Eddings*. The State responds that Kayer procedurally defaulted and failed to exhaust his *Eddings* claim. In the alternative, the State contends on the

merits that the Arizona Supreme Court did not violate *Eddings*.

## 1. Procedural Default and Exhaustion

If Kayer procedurally defaulted and did not properly exhaust his causal nexus claim under *Eddings*, we may not grant his habeas petition on this claim. 28 U.S.C. § 2254(b)(1)(A), (c); *Wainwright v. Sykes*, 433 U.S. 72, 86–87 (1977). A petitioner "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). It is a close question whether Kayer has procedurally defaulted and failed to exhaust his *Eddings* claim. Because we conclude that if we reach Kayer's *Eddings* claim we must deny it on the merits, we will assume without deciding that there was no procedural default and failure to exhaust.

## 2. Merits

We held in *McKinney v. Ryan*, 813 F.3d 798, 802, 821 (9th Cir. 2015) (en banc), that the Arizona Supreme Court's "causal nexus" rule, which "forbade as a matter of law giving weight to mitigating evidence . . . unless the background or mental condition was causally connected to the crime," violated *Eddings*. Our opinion in *McKinney* included a long string cite of cases in which the Arizona Supreme Court had applied its unconstitutional causal nexus test. The string cite included the Court's affirmance of Kayer's death sentence on direct appeal. *See McKinney*, 813 F.3d at 816 (citing *Kayer*, 984 P.2d at 46).

In explaining its conclusion that Kayer's alleged "mental impairment" was not a mitigating circumstance, the Arizona Supreme Court on direct appeal wrote that Kayer "offered no evidence to show the *requisite causal nexus* that mental impairment affected his judgment or his actions at the time of the murder." *Kayer*, 984 P.2d at 46 (emphasis added). The emphasized language shows that the Arizona Supreme Court viewed causal nexus as a prerequisite to the existence of a mitigating circumstance—not merely, as the state argues, as a factor bearing on the weight to be accorded to a mitigating circumstance. The Court therefore erred in rejecting Kayer's proffered mental impairment evidence on the ground that the alleged impairment did not have a causal nexus to the commission of the crime. *See McKinney*, 813 F.3d at 821.

However, we cannot grant habeas relief if a constitutional error was harmless. *See Brecht*, 507 U.S. at 637. Here, the error was harmless. The Arizona Supreme Court's causal nexus ruling was an alternative holding. The Court's principal holding was that Kayer had presented so little evidence of mental impairment that he had failed to establish even the existence of any such impairment. *See Kayer*, 984 P.2d at 46. We recounted above the scant evidence of mental impairment presented by Kayer's counsel during the penalty phase. Based on the evidence then before it, the Arizona Supreme Court made a reasonable determination of the facts in concluding that Kayer suffered from no mental impairment. 28 U.S.C. § 2254(d)(2).

## B.  Ineffective Assistance of Counsel

Kayer also contends that he was denied his Sixth Amendment right to effective assistance of counsel due to his attorneys' inadequate mitigation investigation in preparation

for his penalty phase hearing. *See Wiggins v. Smith*, 539 U.S. 510, 521–22 (2003). Kayer argued to the state PCR court, and continues to argue here, that his defense attorneys should have taken steps to investigate mitigation evidence beginning at the time of their appointment. Kayer presented to the PCR court evidence relating to both deficient performance and prejudice.

### 1. Deficient Performance

#### a. Linda Williamson

Kayer was indicted on December 29, 1994. Linda Williamson was appointed to represent him in January 1995. Williamson was then in her fourth year as a lawyer. She testified in the state PCR court that after graduating from law school she had worked for the Maricopa County Public Defender's office for three years. While there she had "participated in" "at least" six criminal trials. In December 1993, she left that office and moved to Prescott, Arizona, in Yavapai County. After arriving in Prescott, she worked for eight months for a criminal attorney and did one "misdemeanor DUI." She then began work as a contract attorney for the county. When Williamson got the contract to represent Kayer shortly thereafter, she had never represented a client in a murder case, let alone a capital case.

Williamson testified in the PCR court that Kayer told her that he had not killed Haas. Williamson's paralegal's billing records reflect that this interview took place around February 1995, about a month after Williamson was appointed. After interviewing Kester, Williamson concluded that a jury was likely to credit her account rather than Kayer's, and that Kayer's chance of acquittal if Kester testified was "slim to

none." She testified, "I did not see this case as fact-wise being favorable to Mr. Kayer in any way, shape, or form."

Williamson testified that she concluded that the best guilt-phase strategy was to delay and to hope that Kester "would implode and not become the star witness for the state." Kester had previously suffered from drug addiction and she was pregnant with Kayer's child. Williamson hoped that Kester might again succumb to addiction, and that she might disappear or decide not to testify because of her personal relationship with Kayer.

Williamson testified that she asked a more experienced attorney, James Bond, to "second chair" the case. Williamson testified that she engaged Bond to help her with the trial rather than with pre-trial preparation. Bond testified in the PCR court that he billed no time on the case and knew almost nothing about it. The record is unclear as to whether Bond even entered an appearance on Kayer's behalf.

The county compensated Williamson at a very low rate. She testified that the county paid a lump sum of less than $500.00 for the first 80 hours of work, and at a rate of $40.00 per hour after that. Williamson billed a total of 122 hours, including the first 80 hours. Williamson had the assistance of a retired detective who worked as an investigator, though he was billed as a paralegal because he did not have an investigator's license. Williamson testified that the investigator "did a lot of investigation to find out what the State's case [was]."

Williamson represented Kayer for seventeen and a half months. She visited Kayer infrequently, once allowing eight to ten months to elapse between visits. She did no

preparation for a penalty phase trial. She testified, "I can absolutely tell you there was no focus on mitigation as far as penalty phase." Williamson testified that she never consulted a mitigation expert. When asked whether her decision not to investigate mitigation was strategic, she testified, "I don't know if it was strategic." "I can't tell you specifically that I ever thought about mitigation pretrial." Her investigator spent no time preparing for the penalty phase.

On June 21, 1996, Williamson was allowed to withdraw from representing Kayer on the ground that the attorney-client relationship had broken down.

### b. David Stoller and Marc Victor

David Stoller was appointed to replace Williamson at the end of June 1996. Before becoming a defense attorney, Stoller had worked for a number of years as a prosecutor. He testified in the PCR court that as a prosecutor he had tried "probably" forty to fifty felony cases, including one death penalty case. He also had done "some post-conviction relief matters that were death penalty as a prosecutor," and had done two post-conviction matters as a defense counsel. He had never defended a capital case as trial counsel.

Stoller worked on his own for three and a half months. He had no paralegal and he did much of his own secretarial work. Some secretarial work was hired out on a piece-work basis. On September 17, 1996, at the request of Kayer, Marc Victor was appointed as second chair. Victor had graduated from law school two years earlier, in the spring of 1994. Victor had formed a relationship with Kayer while representing him in a "prison contraband" case that arose

while Kayer was being held in county jail awaiting trial in his capital case.

Stoller testified in the PCR court that no mitigation investigation had been done before he was appointed to represent Kayer. He found the guilt-phase work done by Williamson's investigator unhelpful. He testified, "I was going to have to redo, re-plow the ground myself." Stoller testified that he nonetheless did not "initially" "seek the assistance of investigative services" when he was appointed to represent Kayer. Without consulting Stoller, Kayer's family had hired an investigator with their own money. Stoller spoke with that investigator several times on the telephone. He testified that he also found the work of that investigator unhelpful. Stoller never asked the investigator to do any mitigation investigation.

Victor testified in the PCR court that when he came on the case in mid-September 1996 very little had been done. When he first got the case file, it was "a disaster." "I was appalled. I felt that a lot of time had passed. Very little was done and I frankly was embarrassed that I now was an attorney on a case that was so disorganized[.]" Victor filed a "blizzard of motions" in January 1997. At that point, a little more than two years after Kayer's indictment for capital murder and six months after Stoller had been appointed to represent him, no mitigation investigation had been done.

One of Victor's motions, filed on January 15, sought funds for two investigators—a "general purpose" investigator, and a mitigation investigator. The motion was granted on February 24 as to the general purpose investigator, but was "deferred" as to the mitigation investigator "unless and until there was a guilty finding in the case." Victor

testified that the deferral "put a halt to our mitigation efforts
. . . . That would have been less of a problem had I been
involved in this case from the very beginning, and then could
have had a more reasonable opportunity to maybe both do a
mitigation workup myself, as well as prepare motions and get
ready for the guilt phase." "[G]iven the circumstances [that]
the case had substantially languished for an unreasonable
length of time at the time I got involved[,] . . . [the deferral]
was devastating to our ability to undertake mitigation."
Neither Stoller nor Victor sought rehearing of the motion for
funds for a mitigation investigator. Nor did they appeal the
court's deferral of the motion.

Victor testified in the PCR court that, in his view, early
investigation of mitigation evidence was less important at that
time than it later became, after the Supreme Court decided
*Ring v. Arizona*, 536 U.S. 584 (2002), requiring jury
sentencing in capital cases. Victor was asked, "Would you
agree . . . that counsel must begin mitigation investigation
immediately upon an appointment to a capital case?" Victor
responded, "[T]he answer today is a little different than the
answer at the time that I was representing Mr. Kayer, where
in Arizona, at least, the court made [the sentencing decision].
The reason that's important is because there is at least
availability of much more time from the guilt phase to the
sentencing phase, with the judge sentencing."

Trial began on March 5, two weeks after the deferral of
the motion for funds for mitigation investigation. The jury
returned a verdict of guilty on March 26. The court
scheduled Kayer's sentencing hearing for May 27. On April
8, funds were authorized for a mitigation investigator.
According to Stoller's records, his first substantive
conversation with the investigator, Mary Durand, was on May

14, more than a month later, though Stoller testified that he may have talked to her earlier: "Well, I had notes between April 9th and May 14th—whether they were lost—I can't believe I did nothing during this period, but I know that I spoke to her at length on the evening of May 14th and I think I may have had other contacts." Durand first met with Kayer on May 21, a week after the conversation with Stoller and six days before the original date for the sentencing hearing.

### c. Mary Durand

When Mary Durand testified at Kayer's sentencing hearing, she had already worked as a mitigation specialist on almost one hundred capital cases. When she testified in the PCR court, she had worked on one hundred and fifty. She testified in the PCR court that to her knowledge no mitigation specialist in Arizona had worked on more capital cases.

Durand testified in the PCR court that spending a substantial amount of time with a capital defendant, beginning very early in the case, is essential in order to build trust. Most capital defendants "believe, at least initially, that the pursuit of a mitigation case is necessarily a concession of guilt." Durand testified that the "time required to develop rapport and trust with a capital client typically takes a hundred hours." She testified, "When you spend time talking to them, if you have the proper amount of time, every occasion but one, in capital cases that I have done, I have gotten the client's permission to do what I need to do." Durand wrote in an affidavit filed in the PCR court, "[T]o investigate and develop the mitigating factors in a capital case may well require up to 1500 hours," including "200 plus hours (40 hours a month for five months) to interview, review and consult with the client."

Durand testified that it is important to begin mitigation investigation early: "You work with them to help them understand what mitigation is, why it's important[.]" She testified further:

> One of the most important things that you do in mitigation is get all the records that you possibly can, documents that you can have in your hand. And part of that is because many clients who have head injuries, high fevers, brain damage of any kind, accidents and mental illness, don't remember incidents that occurred, or remember them incorrectly.

> So I try not to talk to clients about important issues in their life until I have the records.

Durand testified in the PCR court that her first substantive conversation with Stoller was on May 14. She was emphatic that she had had no substantive conversation with Stoller before that date. When Stoller talked to Durand on May 14, the penalty phase hearing may already have been rescheduled from May 27 to June 24 or 25. (The hearing was ultimately held on July 8.) Durand testified that Stoller did not tell her during their conversation that the penalty phase hearing was imminent and that time was of the essence.

Durand testified that she met with Kayer twice for a total of seven hours, on May 21 and June 5. Durand learned from Kayer when they met on May 21 that the hearing was imminent.

Durand's first meeting with Kayer was a "cold call." She testified, "I had no documents. I had nothing." At that meeting on May 21, Kayer "show[ed] an initial reluctance to allow [her] to pursue mitigation." However, he was willing to provide the names of his mother and sister, along with addresses and phone numbers. He also told Durand that he believed his mother would have some records, though, as it turned out, his mother was unable to locate any records when Durand went to see her. At the first meeting on May 21, Durand persuaded Kayer to sign releases, enabling her to request documents relevant to mitigation. Durand promptly sent requests, accompanied by the releases, to the institutions holding the documents, even though it was likely that few (perhaps none) of the requested documents would be provided in time for the penalty phase hearing. She testified, "I sent [the releases] to all the places that I believed there might be records." None of the school, mental health, and military records sought by Durand were provided by the date of the hearing on July 8.

When Kayer met Durand on May 21, he had never heard the term "mitigation." Durand testified that Kayer "was extremely unhappy when he realized that [a mitigation investigation] should have been started the day he was arrested or indicted, and that the two and a half years he'd already been in the jail could have been used to do the mitigation." She testified:

> I explained what I did in broad terms. He said that he had never heard the term [mitigation] before. Had no idea what it meant. . . .

> We talked at great length about mitigation. He had lots of questions. But everything came back to time; "How much time will that take?"

> And I said, "Well, might take six or eight months just to get the military records."

> His response was, "You don't have six to eight months because I don't have six to eight months." And I could not get him past that.

Kayer allowed Durand to involve his mother and sister and was willing to sign releases. However, Kayer was adamant that he did not want to pursue mitigation research that would involve substantial delay. Kayer did not have "six to eight months" because, Durand testified, he "wanted desperately to get out of the Yavapai County Jail." She testified, "He hadn't been getting his medications [for his heart condition]." Further, and more important, "[H]e was terrified that he was going to be killed, that he would lose his life in that facility." There had already been a murder in the jail, and Kayer "had been assaulted and hospitalized in the jail infirmary for his injuries." Durand's contemporaneous notes of her interviews with Kayer recorded, "Afraid he'll lose his life here."

On June 6, the day after Durand's second meeting with Kayer, the trial court held a case management meeting. Durand was traveling and was unable to attend. Kayer and Victor were present; Stoller appeared by telephone. Stoller informed the court that Kayer "simply did not want to be in the County jail system any longer" and that he opposed any continuance. Kayer told the court that he did not believe that

Durand would be able to discover any useful mitigation information. Kayer stated:

> [F]rom what I understand in my conversation with Mary Durand, she is talking about a fetal alcohol syndrome that possibly existed. She hasn't had the opportunity to investigate it, and some minor areas and details in my life that I personally can't see how they would relate to mitigation in this case. . . . I'm saying I don't see anything here of substantial value. . . . I don't feel the lack of Mary Durand's mitigation is going to be a major factor in the decision [whether I am sentenced to death].

The court indicated that it might be willing to continue the date of the penalty phase hearing for perhaps thirty days and asked Kayer if he wanted a continuance:

> [I]f I do move it, I'm not about to move it anywhere near 180 days off. I'm probably not even thinking seriously about 90 days off. I'm thinking maybe I could be talked into an additional 30 days, something like that, if there was some specific purpose.

Based on his belief that Durand would not be able to discover useful information, Kayer opposed any continuance:

> Believe me, if I thought that—that Miss Durand had valid evidence that should be presented in front of this Court, I'd be scratching and clawing and asking for

180 days as well. I'm not in favor of any more continuances. Does that answer your question?

### d. Keith Rohman

Keith Rohman testified as a mitigation specialist in the PCR court. Rohman had done mitigation work in capital cases for many years. He was a licensed private investigator and Adjunct Professor at Loyola Law School in Los Angeles. He testified in the PCR court: "[O]ne of the very first steps in any capital mitigation representation is to meet the client, start to establish a relationship with the client and attempt the process of collecting a life history, information that might be relevant. . . . [T]hat first meeting is really critical because it is [the] spot where you start the process of educating the client." Rohman testified that a "significant number," of capital defendants initially resist mitigation investigations, "[a]nd so it takes some time to work through[.]" Rohman testified that an additional reason to start mitigation investigation "from day 1" is that information learned in the investigation can sometimes help at the guilt phase of the case. Rohman testified that this "protocol and practice" in the "field of mitigation" had been well established by 1995, when Kayer was indicted.

### e. Larry Hammond

Larry Hammond testified in the PCR court on behalf of Kayer. At the time of his testimony, Hammond had practiced law for thirty-six years. After graduation from law school, he had been a law clerk to Justices Hugo Black and Lewis Powell. He had been a founding board member of the Arizona Capital Representation Project in 1989, and had

continued as a board member since then. He had been Chair of the State Bar Indigent Defense Task Force, paying particular attention to representation in capital cases, since the mid-1990s. He had been appointed in the late 1990s by the Arizona Supreme Court to serve on the Post-Conviction Relief Appointment Committee, whose function was to "screen applicants for appointment to undertake work as post-conviction relief counsel in capital cases." Hammond's Phoenix law firm had had at least one active capital case in the office at all times since 1981, and he had been the "lawyer primarily responsible for all of them." He had been lead counsel in ten capital cases. In three of those cases, he had been lead counsel from start to finish—two cases in Arizona state court in 1991 and 1994, and one case in federal court in Arizona in 2005.

Hammond's testimony focused on the standard for effective assistance of counsel in capital cases that had been established by 1995, when Kayer was indicted. Specifically, Hammond testified that the standard of practice he described was based on ABA guidelines from 1989 and other sources from that period. "[T]he information that I provided [in my testimony today] was well known in Arizona and elsewhere from as far back as the 1980s."

Hammond testified that in a capital case "it is of critical importance to develop both the guilt-innocence side of the case and the sentencing side of the case from the beginning." Hammond testified, consistently with Durand, that capital defendants initially resist doing mitigation research at the beginning of a case. In part, defendants "instinctively" believe that mitigation will become relevant only after conviction, and they want their attorneys to focus on the guilt-innocence side of the case. Further, defendants are

"embarrassed" and do not want to involve people such as "family members and their high school basketball coaches and people who they have known growing up." Still further, conditions in county jails are not conducive to effective communication: A client is "there for 19 months or 20 months or two years waiting for trial. So dealing with a client and explaining to a client why mitigation is important in that environment can be doubly difficult." Finally, "most people charged with capital crimes have some form of what I would call a mental health issue or problem."

Hammond testified that a capital defendant's initial resistance is almost always overcome when a client is properly advised at the beginning of the case:

> [I]n case after case after case the opening experience—not just with me and my clients—but with the other defendants facing death . . . was what I described earlier. This resistance. But eventually for virtually every one, virtually every one of those defendants, they began to see that the mitigation part of the case was important.

Hammond specifically addressed the need to educate judges, as well as clients, about the importance of getting an early start on mitigation work. He testified, "[A] mere denial of either the client to wanting to do mitigation or the court to providing the resources cannot be the end of the conversation." "[T]here is an inherent logic and simplicity in getting the resources necessary for capital defense. And in cases all across the country once the case is laid out, once the explanation is given to good judges about what is necessary and why it's necessary, the experience is that good judges

say: 'I understand that and now we will work together to make it happen.' "

Hammond also specifically addressed Victor's view that getting an early start on mitigation work was less important during the pre-*Ring* period when judges rather than juries determined sentences in capital cases in Arizona. Hammond was unequivocal that Victor was incorrect:

> The need for the development of a mitigation case is no different in Arizona prior to *Ring* than it is after *Ring*. . . . [T]he concept that a lawyer can simply wait until after the guilt phase to begin doing mitigation is simply wrong. . . . If you knew nothing else other than that a capital defense lawyer said "I can defer all mitigation until after the trial", that lawyer is acting at a level far below what is deemed acceptable under any kind of a *Strickland* analysis for lawyers in Arizona or in any of the other six or seven states that prior to *Ring* had judge sentencing.

## 2. Prejudice

Kayer's post-conviction counsel presented extensive mitigation evidence in the PCR court. His post-conviction counsel contended that his trial attorneys could have uncovered and presented this evidence at his sentencing hearing if they had performed a proper mitigation investigation.

a. Personal and Family History

Kayer was born in Long Beach, California, in August 1954. In the first of many moves, the family moved to Denver when he was two. Kayer's father left the family shortly after arriving in Denver. He never returned to the family. He died of a heart attack at age thirty-nine. After his father left the family, Kayer, his older stepsister, and his mother moved to Bloomington, California.

According to his mother and his uncle, Kayer was slow to walk. He had poor balance and fell frequently. His mother recounted that "he always had bruises . . . on his head and body." His uncle recounted that his mother was afraid to take him shopping because he was "covered with bruises." According to his uncle, he was slow at all his developmental stages. His mother recounted that Kayer had great trouble falling asleep.

Kayer was dyslexic. In an interview with Mark Goff, an investigator for Keith Rohman, Kayer stated that he was good with numbers, but that "[t]o this day he has to write things three or four times to get the spelling right." Kayer recounted in the interview that "[i]n school he flunked English, but got A's in everything else." (As will be seen in a moment, Kayer's recounting of his school grades was inaccurate to the point of being delusional.) Kayer told Goff that at age seven he came to believe (and then continued to believe) that he had come to earth from another planet.

Kayer and his mother moved to Arkansas after ninth grade. Kayer began using drugs when he was sixteen. He told Goff that he would "smoke weed almost every day," and would usually use speed on the weekends. He recounted

"Speed works good for a night owl." Kayer would sometimes use LSD.

Some of Kayer's high school grades are in the record. In the fall of the ninth grade in Fontana, California, he got one B (in Drafting), five Cs, and one D (in English). In the spring, he got two Bs (in Typing and PE), one C, two Ds, and two Fs (in History and English). In fall of the tenth grade in Morrilton, Arkansas, he got one C (in English), four Ds, and one F (in Algebra). In the spring, he got one B (in Speech), two Ds, and two Fs (in English and PE). Kayer left high school, in Seligman, Arizona, without graduating, leaving either at the end of his junior year or part way through his senior year.

After leaving high school, Kayer enlisted in the Navy. He was seventeen years old. Within eight months, he had two "unauthorized absences" ("UAs"). He was arrested and jailed in Texas at the end of his first UA. He returned voluntarily from his second UA "in order to see a psychiatrist." In May 1973, after his second UA, Kayer was referred to Bethesda Naval Hospital with a diagnosis of "schizoid personality." He was held there for a little more than three weeks. Kayer was discharged from Bethesda with a diagnosis of "passive-aggressive personality." In a written evaluation at discharge, Lieutenant Commander M. D. Fitz, head of the "Enlisted Psychiatric Service," characterized Kayer's "impairment" as "severe." Fitz wrote, "In view of the severity of his personality disorder it is recommended that he be administratively separated from the service."

After his release from the Navy, Kayer returned to Arizona. At various times, he attended Yuma Community College, Arizona State University, and Arizona Western

College, but received no degrees.  In his interview with Goff, Kayer stated that he never got a degree because he believed he could make more money buying and selling jewelry than with a degree.

Kayer had two unsuccessful marriages in his early twenties.  Kayer's second marriage was to an Afghan woman. Kayer maintained in his interview with Goff that her uncle was "the deposed king of Afghanistan."

When Kayer was twenty-five or twenty-six, he met Cindy Seitzberg.  Kayer and Seitzberg never married, but they lived together for several years.  They had a son, Tao, who was dropped in the delivery room and suffered permanent brain damage.  About six months after Tao's birth, Seitzberg began work as a stripper while Kayer stayed home to take care of Tao.  When Tao was about one, Seitzberg left Kayer. Kayer's half-sister Jean Hopson testified in the PCR court, "[Cindy] had brought [Tao] to my mother's and asked if she would like to keep him for the weekend, and my mother said 'yes.'  And we never saw her again."  Hopson and Kayer's mother became co-guardians of Tao.

Beginning in his mid-twenties, Kayer began committing property crimes.  He first committed a series of burglaries with a friend, Peter Decell.  They were caught, and Kayer served a short time in jail in Arizona. Shortly after his release from jail, Kayer was arrested for burglary in Arkansas.  Later, when she was pregnant with Tao, Seitzberg served as a lookout for Kayer while he committed burglaries.  Kayer continued committing burglaries well into his thirties.

Interspersed with his burglaries, Kayer worked as a photographer, a salesperson for a satellite communications

company, a hazardous waste remover, and a buyer, maker and seller of jewelry. He never held a job for a sustained period. His cousin, Barbara Rogers, testified at the PCR hearing, "[H]e had trouble with holding . . . a job. . . . He had trouble working for others. . . . [H]e had a lot of emotional problems, depression."

Kayer began drinking alcohol regularly when he was about twenty-one, and soon became a very heavy drinker. Peter Decell recounted that during their time together Kayer would drink beer "for breakfast, lunch and dinner." Kayer reported that when he was twenty-five he was drinking half a quart of bourbon a day. When Kayer checked himself into a Veterans Administration hospital at age thirty-five, Dr. A. Rodriguez reported that Kayer was "acutely intoxicated." "He presented himself with a very strong odor of alcohol, and it was very difficult for him to get his thoughts together because of alcohol intoxication. The patient had been drinking continuously and heavily for the past seven years[.]"

Sometime in his twenties, Kayer became a compulsive gambler. His half-sister Jean Hopson testified that he had a "gambling addiction." Kayer told Hopson that he had a gambling "system." Kayer's cousin, Barbara Rogers, testified that her close girlfriend dated Kayer for a time, and that when the girlfriend and Kayer went to Las Vegas, "she could not get him away from the . . . gambling table. He would not leave." In his mid-thirties, while in prison in Arizona on a burglary conviction, Kayer engaged in illegal bookmaking. After release and while on "house arrest," Kayer took off his ankle bracelet and flew to Las Vegas to gamble. Kayer turned himself in after he had lost all his money. He was sentenced to an additional nineteen months for violation of parole.

Beginning shortly after his release from the Navy at age eighteen, Kayer experienced severe mood swings. His mother and sister both described his mood swings in their testimony at his sentencing hearing. *See supra* at 9–10. Barbara Rogers testified in the PCR court about Kayer's "manic behavior." As an example, she described a trip Kayer decided to take, "out-of-the-blue when it wasn't prepared, it wasn't a good time." "I kept telling him no. And he was just real excited about it, wouldn't stop talking about it." In her interview with Goff, Seitzberg recounted, "I would stay up with him at night and . . . would see mood swings. . . . [He] would either work [at something] all out, or do nothing."

In 1983, shortly after the birth of his son Tao, Kayer went voluntarily to a VA hospital. Kayer was twenty-nine. He was observed to be "agitated" and "tearful." Kayer is quoted on the VA form as saying, "I just want to know what's wrong." The form records: "P: to see MD." Immediately below, a doctor with an illegible signature wrote, "Pt is depressed with some suicidal ideation" and "diagnosis: adjustment disorder with depressed mood."

Six years later, in 1989, Kayer checked himself into a VA hospital, where he was kept for eighteen days. Dr. A. Rodriguez wrote on the VA form that Kayer had been "admitted . . . with depression and suicidal ideation." "He admitted to suicidal and homicidal ideations towards his girlfriend [who had just left him] and her boyfriend, but didn't plan to do anything to them while he is in the hospital, and wanted some help." Dr. Rodriquez wrote that Kayer "showed bipolar traits." At the time of discharge, Kayer was "not considered to be a danger to himself or others." At discharge, he was prescribed one month's supply of lithium, a standard medication for bipolar disorder.

In 1990, Kayer was referred to a VA "Day Treatment Center" for therapy, with a "provisional diagnosis" of "Personality Disorder/Bipolar." Kayer told a probation officer in 1990 that until he was diagnosed during his stay at the VA hospital in 1989 "he had no idea what was wrong with him."

Kayer had a history on both sides of the family of alcoholism, compulsive gambling, and mental illness.

Kayer's father, who left the family when Kayer was two and died at age thirty-nine of a heart attack, was an alcoholic and compulsive gambler. One witness testified at the PCR hearing that Kayer's father "wasn't happy unless he was gambling."

On his mother's side, Kayer's Aunt Opal Irene Marchman (one of his mother's three sisters) testified about herself in the PCR court, "I have [heard voices] all my life. My grandpa heard voices. It runs in the family." She testified that Kayer heard voices, too: "I was just telling him about my life and he said 'I thought it was normal[.] I hear voices, too.'" She testified, further, that alcoholism and depression "run[] in the family."

Kayer's Aunt Ona Mae Tanner (another of his mother's sisters) was an alcoholic with severe mood swings. Ona Mae's daughter, Jean Reilly, was an alcoholic and compulsive gambler who was first diagnosed as schizophrenic and then as bipolar (manic depressive). Jean Reilly's niece, Barbara Rogers, testified in the PCR court that Jean had "electric shock therapy" after a "nervous breakdown." Jean's daughter, Constance Stabile, testified, "[A]bout every year [Jean] would get manic, very manic and

hyper and she couldn't sleep and [would] lose weight[.]" Stabile testified that Jean married her last husband on a manic high a week after meeting him at an Alcoholics Anonymous meeting, and that she once went to Las Vegas on a manic high and "blew" her "entire retirement" in a single weekend.

Kayer's Aunt Olita "Aunt Tomi" Sandstrom (the third of his mother's sisters) was an alcoholic. Aunt Opal Irene testified in the PCR court that her "baby sister" Olita drank "excessively." She testified that Olita was also severely depressed: "She would just sit and stare into space like—it was bad."

Kayer's Uncle John Williams (his mother's one brother) also had mental problems. Aunt Opal Irene testified, "He fell and hit his head in a creek in Oklahoma and he just never did do too good after that." John Williams' niece, Barbara Rogers, testified, "My Uncle John was a thief, a robber, he held his own family members at gunpoint and knifepoint a few times. And he just was not a good person to have around."

On October 21, 1994, Kayer was admitted to a VA hospital after suffering a severe heart attack. He had just turned forty. His father had died of a heart attack at age thirty-nine. The VA hospital form recorded, "The patient . . . presented . . . with a history of anterior precordial chest pain starting at about 1 o'clock in the afternoon, no relief after three beers." Doctors wanted to keep Kayer in the hospital, but after three days he checked himself out "against medical advice."

Kayer killed Haas six weeks later.

### b.  Professional Assessments

### (1)  Dr. Anne Herring

Dr. Anne Herring, an Associate Professor of Clinical Psychiatry and Neurology at the University of Arizona, examined Kayer in prison on March 16, 2005, and administered an extensive battery of tests.  She testified in the PCR court that Kayer received average scores on all tests except one.  Dr. Herring wrote in her report that "on one of the more cognitively challenging tests" Kayer "demonstrated significant difficulty when required to execute complex problem solving and persisted in applying incorrect concepts despite receiving feedback."  She wrote, "[S]imilar deficits have been associated with chronic heavy substance abuse, traumatic brain injury, and with bipolar disorder."

### (2)  Dr. Michael Sucher

Dr. Michael Sucher, a specialist in "alcohol and drug addiction medicine" and Acting Director for the Arizona Division of Behavioral Health in the Department of Health Services, examined Kayer in prison on April 5, 2005, for approximately two hours.  Dr. Sucher reviewed Kayer's medical and psychological records in connection with his examination.

In his report, Dr. Sucher reviewed Kayer's history of "chronic alcohol dependence," and extensive history of compulsive gambling.  Dr. Sucher wrote that Kayer had spent "probably one-quarter to one-third" of his interview discussing gambling and the "systems for winning" he had developed.  Dr. Sucher wrote, "He really is in effect, completely obsessed with gambling."

Dr. Sucher testified in the PCR court that at the time of the crime Kayer was impaired by the combination of alcoholism and obsessive gambling:

> [H]e had untreated alcoholism and untreated pathological gambling; that both of those disorders impair one's judgment. And . . . the pursuit of continued gambling and the pursuit of continued drinking often make individuals who are so impaired do things that they would not normally do, some of which may involve the commission of a crime or crimes.

### (3)  Dr. Barry Morenz

Dr. Barry Morenz, an Associate Professor of Clinical Psychiatry at the University of Arizona, board certified in General Psychiatry and in Forensic Psychiatry, interviewed Kayer in prison on March 24 and April 19, 2005, for a total of five and a half hours. Like Dr. Sucher, Dr. Morenz reviewed Kayer's medical and psychological records in connection with his interviews.

Dr. Morenz wrote an extensive report and testified at length in the PCR court. Dr. Morenz wrote that Kayer spent much of the interview talking about gambling, explaining, among other things, how he had developed a system for predicting winning lottery numbers. Kayer told Dr. Morenz that "the numbers for tomorrow's lottery are already known in the collective unconscious," and that "using his spirit guides and his mathematical algorithm," he could predict these numbers and "when he is released make 20 million dollars." Kayer also explained his belief in reincarnation (which he called "recycling"), and his belief that there is

"residue in him from when Mars was populated and perhaps populations from other worlds as well." (As noted above, *supra* p. 35, Kayer began at age seven to believe that he had come from another world.) Dr. Morenz characterized Kayer's beliefs as "really delusional."

Dr. Morenz provided a diagnosis of Kayer at the time of the interviews: "Bipolar type I disorder, hypomaniac; Alcohol dependence in a controlled environment; Polysubstance abuse in a controlled environment; Pathological gambling; Cognitive disorder not otherwise specified." More important for our purposes, Dr. Morenz provided a diagnosis as of 1994:

> There are a number of factors that have increased the risk of Mr. Kayer developing a number of psychiatric problems. First, there is considerable comorbidity among psychiatric diagnoses. . . . In Mr. Kayer this is relevant because people with bipolar disorders and personality disorders are at an increased risk of developing substance abuse disorders. Also, people with personality disorders have an increased risk of mood disorders. Secondly, Mr. Kayer had a family history of problems with alcohol, gambling and bipolar disorder that increased his risk of developing one or more of these disorders. Thirdly, as a child Mr. Kayer grew up with significant instability including frequent moves and his father's sudden death when Mr. Kayer was still very young which probably contributed to his later psychiatric difficulties. There is evidence that even as a child Mr.

Kayer was showing signs of emotional problems as his performance in school was not good. This poor school performance was probably an early sign of a bipolar disorder or a personality disorder or a combination of the two. By the time Mr. Kayer washed out of the military Mr. Kayer likely had moderately severe psychiatric problems that went untreated. . . . [I]t seems clear that he has suffered from serious psychiatric problems during most of his adult life and he continues to show signs of those problems today. . . .

At the time of the murder in 1994 Mr. Kayer was probably having serious psychiatric problems. He was having problems with bipolar disorder symptoms and may have been manic or hypomanic, he was having difficulties with out of control pathological gambling and he had difficulty with extensive alcohol abuse. These difficulties were likely superimposed on his personality disorder problems and his cognitive disorder not otherwise specified. Mr. Kayer's belief that he would not live long as a result of the heart attack he had suffered a few weeks before the murder was another important source of emotional distress that was likely exacerbating all his other problems during this period.

### 3. Discussion

The Sixth Amendment guarantees effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). A defendant is denied his or her right to effective assistance when "counsel's representation f[alls] below an objective standard of reasonableness" and "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688, 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

The right to effective assistance of counsel extends to the sentencing phase of a capital trial. *Id.* at 686–87. All criminal defense attorneys have a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691. For capital defense attorneys, this duty to investigate includes an "obligation to conduct a thorough investigation of the defendant's background." *Williams v. Taylor*, 529 U.S. 362, 396 (2000).

In a brief written order, the state PCR court held that Kayer had not established a Sixth Amendment violation under *Strickland*. The court wrote as to his attorneys' performance:

> The court concludes that at the time of sentencing, the defendant voluntarily prohibited his attorneys from further pursuing and presenting any possible mitigating evidence.

In the alternative, the court wrote as to prejudice:

> This court further concludes that **if** there had
> been a finding that the performance prong of
> the *Strickland* standard had been met, that no
> prejudice to the defendant can be found.

(Emphasis in the original.)

The order of the PCR court was the last reasoned decision of the state court. *Wilson v. Sellers*, 138 S. Ct. 1188, 1194 (2018). We must determine whether the PCR court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" as of May 8, 2006, when the state PCR court issued its decision, or was an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2).

### a. Performance

With respect to the "performance prong," the state PCR court concluded that Kayer's attorneys had provided effective assistance. Its only finding in support of that conclusion was that "at the time of sentencing" Kayer had voluntarily prohibited his attorneys from pursuing and presenting any additional mitigating evidence. We need not disturb the PCR court's conclusion that Kayer acted voluntarily at the time of sentencing in prohibiting his counsel from pursuing mitigation, for the state PCR court asked, and answered, the wrong question. The question is not whether Kayer voluntarily prevented his counsel from pursuing mitigation in mid-1997. The question is whether Kayer's counsel should have begun mitigation efforts when first appointed to

represent him in January 1995. Kayer presented precisely this question to the PCR court.

"The failure to timely prepare a penalty-phase mitigation case is . . . error." *Allen v. Woodford*, 395 F.3d 979, 1001 (9th Cir. 2005). Mary Durand, Larry Hammond, and Keith Rohman all testified in the PCR court that in 1995 professionally competent representation required that mitigation efforts be started at the very beginning of a capital case. Durand testified that it is essential to spend substantial time with a capital defendant, beginning very early in the case, in order to build trust and understanding. Hammond testified that "it is of critical importance to develop both the guilt-innocence side of the case *and* sentencing side of the case from the beginning." (Emphasis added.) Rohman testified that "one of the very first steps in any capital mitigation representation is to meet the client, start to establish a relationship with the client and attempt the process of collecting a life history[.]" Hammond and Rohman both testified that by 1995 it had become standard practice in capital cases to begin mitigation efforts at the outset of a case. Hammond cited the 1989 American Bar Association guidance for capital representation, and testified that "the information I provided [in my testimony today] was well known in Arizona and elsewhere from as far back as the 1980s." Rohman testified that the "protocol and practice" he described had been well established by 1995.

In *Rompilla v. Beard*, 545 U.S. 374 (2005), decided a year before the decision of the PCR court, the Supreme Court held that defense counsel had rendered deficient performance by failing to investigate properly in preparation for the penalty phase hearing. In reaching its conclusion, the Court relied on performance standards established by the American Bar

Association. The Court wrote, "[T]he American Bar Association Standards for Criminal Justice in circulation at the time of Rompilla's trial describes the obligation in terms no one could misunderstand[.]" *Rompilla*, 545 U.S. at 387. After quoting the relevant 1982 ABA Standards, the Court wrote, "'[W]e long have referred [to these ABA Standards] as 'guides to determining what is reasonable.'" *Id*. (alteration in original) (quoting *Wiggins v. Smith*, 539 U.S. at 510, 524 (2003). In a footnote, the Court referred to the 1989 ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ("1989 ABA Guidelines"), promulgated shortly after Rompilla's trial, noting that they were "specifically devoted to setting forth the obligations of defense counsel in death penalty cases." *Id.* at 387 n.7. *See also Wiggins*, 539 U.S. at 524 (relying on the "well-defined norms" of the 1989 ABA Guidelines, describing them as "standards to which we long have referred as 'guides to determining what is reasonable'").

The 1989 ABA Guidelines state unambiguously that defense counsel in capital cases should begin investigation for the penalty phase as soon as they are appointed. Guideline 11.4.1(A) provides, "Both [guilt/innocence phase and penalty phase] investigations should begin immediately upon counsel's entry into the case and should be pursued expeditiously." Guidelines 11.8.3(A) provides, "[P]reparation for the sentencing phase, in the form of investigation, should begin immediately upon counsel's entry into the case."

Linda Williamson was appointed to represent Kayer at the beginning of January 1995, six years after the issuance of the 1989 ABA Guidelines. Williamson represented Kayer for a year and a half. During that time, she did no mitigation

investigation.    David Stoller was appointed to replace
Williamson at the end of June 1996.  For six months, he did
no mitigation investigation.  Marc Victor, who was appointed
to assist Stoller, moved on January 15, 1997, for funds to hire
a mitigation investigator.  On February 24, the judge deferred
ruling on the motion until after conviction.  Neither Stoller
nor Victor appealed or sought reconsideration of the order.
Funds for a mitigation investigator were finally authorized on
April 8.  Stoller had his first substantive conversation with the
mitigation specialist, Mary Durand, on May 14.  Durand first
met with Kayer on May 21, almost eleven months after
Stoller was appointed and almost two and half years after
Williamson was appointed.  When Durand met with Kayer on
May 21, Kayer had never heard the term "mitigation."  The
penalty phase hearing, which had originally been set for
May 27, was held on July 8.

We hold that in failing to begin penalty phase
investigation promptly after they were appointed, Kayer's
attorneys' "representation fell below an objective standard of
reasonableness."    *Strickland*, 466 U.S. at 688.    The
conclusion of the state PCR court that Kayer's attorneys
provided constitutionally adequate performance was
"contrary to, or involved an unreasonable application of,
clearly established Federal law, as determined by the
Supreme Court."   28 U.S.C. § 2254(d)(1); *see Rompilla*,
545 U.S. at 387.

### b.  Prejudice

A habeas petitioner must establish not only deficient
performance, but also "a reasonable probability that, but for
counsel's unprofessional errors, the result of the proceeding
would have been different."  *Strickland*, 466 U.S. at 694.

There are two questions to be answered in determining whether Kayer was prejudiced by his attorneys' deficient performance. First, if his counsel had begun mitigation efforts at the outset of the case, would Kayer have cooperated? (Because, as will be seen in a moment, the answer to this question is "yes," we need not ask what his counsel would have been able to discover in the absence of Kayer's cooperation.) Second, was the mitigation evidence that was presented to the PCR court sufficient to establish a "reasonable probability," "sufficient to undermine confidence in the outcome," that the result of the sentencing hearing would have been different? We address each question in turn.

### (1) Would Kayer Have Cooperated?

Mary Durand testified in the PCR court that it is common for capital defendants to resist mitigation efforts at the beginning, but that they virtually always come around and cooperate with such efforts. When Durand testified in the PCR court, she had worked on one hundred and fifty capital cases. She testified, "When you spend time talking to them, if you have the proper amount of time, every occasion but one, in capital cases I have done, I have gotten the client's permission to do what I need to do." Larry Hammond testified to the same effect in the PCR court: "[E]ventually for virtually every one . . . of those defendants, they began to see that the mitigation part of the case was important."

Kayer's objection "at the time of sentencing" to further mitigation research was not based on a categorical objection to involving family members or to sharing personal information. Indeed, he willingly provided contact information for his mother, suggested that his mother might

have relevant documents, and signed waivers that allowed Durand to seek school, military, medical and psychological records. Rather, his objection was based on two factors. First, he wanted to be transferred out of the Yavapai County Jail. There had been a murder in the jail, and Kayer had been attacked in the jail. Durand testified in the PCR court that Kayer "was terrified that he was going to be killed, that he would lose his life in that facility." When Durand told Kayer on May 21 that she needed six to eight months, he responded, "I don't have six to eight months." Second, as Kayer told the trial court on June 6, he believed (mistakenly) that nothing valuable would be discovered if a continuance were granted. If he had believed that a continuance would produce valuable information, he would have strongly supported a continuance. As he expressed it, "Believe me, if I thought that—that Miss Durand had valid evidence that should be presented in front of this Court, I'd be scratching and clawing and asking for 180 days as well."

The state PCR court made no factual finding with respect to whether, if mitigation efforts had been begun at the outset of the case, Kayer would have cooperated in those efforts. So there is no factual finding to which we can defer. However, even if we were to assume that the PCR court had made such a finding, it would be have been "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The uncontradicted testimony of Durand and Hammond established that it was a virtual certainty that Kayer would have cooperated in a mitigation investigation if it had begun in January 1995, at the beginning of the case, rather than in late May 1997.

(2) Reasonable Probability of a Different Outcome?

(i) Waiver of Argument

Kayer presented to the PCR court extensive and uncontroverted evidence of mental impairment. The State could have argued to us that even if Kayer's counsel had sought to begin mitigation efforts at the outset of the case, funds for mitigation investigation would not have been authorized until after Kayer's conviction. If this were so, the State could have argued, much of the evidence presented to the PCR court would not have been discovered and developed even by competent counsel.

However, the State has not made this argument, perhaps because it does not want to implicate itself as contributing to the ineffectiveness of Kayer's representation. We therefore consider the argument waived. However, even if the State had made the argument, we would reject it for essentially two reasons.

First, Larry Hammond testified that a competent capital defense attorney should work to persuade a judge of the necessity of early authorization of funds for mitigation investigation, and that a good judge will understand the necessity and will authorize the funds. As described above, Hammond testified, "[O]nce the explanation is given to good judges about what is necessary and why it's necessary, the experience is that good judges say: 'I understand that and now we will work together to make that happen.'"

Second, even if the State would not have provided mitigation investigation funds at the outset of the case, a competent attorney could have done a great deal in their

absence.  One of the keys to a competent investigation, as explained by Durand, is early gathering of medical, psychological, school, and other documents.  It would have been a simple and inexpensive task to obtain waivers from Kayer and to send for such documents.  Durand obtained waivers from Kayer at her first meeting with him and sent for the documents immediately thereafter.  It would also have been a relatively simple task to interview known and easily accessible friends and relatives.  Williamson had an investigator, but she never asked him to do such work.  When Stoller took over the case, he learned that Kayer's family had hired an investigator at their own expense.  Stoller could have asked that investigator to do such work, but he did not do so. It would likely have been necessary to wait for state funding to hire expert witnesses such as Drs. Henning, Sucher and Morenz, but experts could have done their work fairly quickly, even after conviction, if the relevant documents had already been obtained and interviews had already been done.

### (ii)  Effect of New Evidence

Under Arizona law in 1997 when Kayer was sentenced to death, mental impairment could be either a statutory or non-statutory mitigating circumstance, depending on the degree of impairment.  There were five listed "statutory" mitigating circumstances under Arizona law. The first of these was mental impairment:  "The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution."  Ariz. Rev. Stat. § 13-703(G)(1) (1977).  (All references are to the 1997 version of Arizona Revised Statutes unless otherwise indicated.)  If evidence of a "mental condition" did not establish a mental impairment within the meaning of the

statutory mitigator and instead "merely establishe[d] a character or personality disorder," the mental condition was considered as a non-statutory mitigator. *State v. Fierro*, 804 P.2d 72, 86 (Ariz. 1991) (internal quotation marks omitted). In Kayer's case on direct appeal, the Supreme Court of Arizona held that he had presented insufficient evidence to establish the existence of any mental impairment, whether as a statutory or a non-statutory mitigator.

A comparison of Kayer's case with other Arizona cases demonstrates that the evidence he presented to the PCR court was sufficient to establish a statutory mitigating circumstance under Ariz. Rev. Stat. § 13-703(G)(1). *See*, *e.g.*, *State v. Stevens*, 764 P.2d 724, 727–29 (Ariz. 1988) ("capacity to appreciate the wrongfulness of his conduct had been impaired by his longterm use of drugs and alcohol" and constituted a mitigating circumstance under § 13-703(G)(1)); *State v. Gretzler*, 659 P.2d 1, 16–17 (Ariz. 1983) (drug use beginning at age thirteen and continuing for over nine years "likely impaired defendant's volitional capabilities" and constituted a mitigating circumstance under § 13-703(G)(1)).

In many ineffective assistance of counsel cases, enough evidence has already been presented at the time of sentencing to establish a mitigating circumstance. In such cases, when additional evidence relevant to that circumstance is later presented to the state habeas court, the additional evidence is cumulative and typically does not establish prejudice. *See*, *e.g.*, *Smith v. Ryan*, 823 F.3d 1270, 1296 (9th Cir. 2016) ("brain scans . . . were largely cumulative of the mitigating evidence presented by Dr. Parrish"); *Cunningham v. Wong*, 704 F.3d 1143, 1163 (9th Cir. 2013) ("Dr. Coburn's testimony about Cunningham's mental state . . . would [ ] have been cumulative"); *Lopez v. Ryan*, 678 F.3d 1131, 1138

(9th Cir. 2012) ("[T]he claim was a very narrow one and related only to supplemental evidence"); *Moormann v. Ryan*, 628 F.3d 1102, 1113 (9th Cir. 2010) (finding no prejudice because of the "cumulative nature of the new evidence").

Kayer's case is fundamentally different. The minimal evidence of mental impairment presented at Kayer's penalty phase hearing was so speculative that the sentencing judge and the Arizona Supreme Court on direct appeal found no mental impairment whatsoever. Not only was the evidence insufficient to establish a statutory mitigating circumstance under Ariz. Rev. Stat. § 13-703(G)(1); it was insufficient even to establish a non-statutory mitigating circumstance. Instead of being cumulative, the evidence presented to the PCR court of Kayer's mental impairment established for the first time its very existence.

The sentencing court and the Arizona Supreme Court on de novo direct review weighed two statutory aggravating circumstances against one non-statutory mitigating circumstance. If the evidence of Kayer's mental impairment presented to the PCR court had been presented to the sentencing court, that court and the Arizona Supreme Court would have added to the balance the statutory mitigating circumstance of Kayer's mental impairment.

The two aggravating circumstances were commission of the crime for "pecuniary value" under Ariz. Rev. Stat. § 13-703(F)(5), and a prior conviction of a "serious offense" under Ariz. Rev. Stat. § 13-703(F)(2). The second aggravating circumstance was relatively weak. "Serious offense" was broadly defined under the statute, and Kayer's offense was at the less serious end of the spectrum. Among the specified "serious offenses" were first degree murder,

second degree murder, manslaughter, aggravated assault resulting in serious physical injury, sexual assault, and any dangerous crime against children. Ariz. Rev. Stat. § 13-703(H)(1)–(6). Kayer's prior conviction was for first degree burglary.

The one mitigating circumstance at sentencing was the relatively weak non-statutory mitigator of Kayer's importance in the life of his son. If the evidence presented to the PCR court had been presented to the sentencing court, it would have established an additional mitigating circumstance—the statutory mitigator of mental impairment under Ariz. Rev. Stat. § 13-703(G)(1).

The evidence supporting a finding of mental impairment was extensive and uncontroverted. Kayer was slow to walk and develop. Starting at age seven and continuing into adulthood, Kayer believed that he was a reincarnated being from another planet. He was dyslexic, was moved from school to school, and got poor grades. He began using drugs, including marijuana and speed, beginning in his teens. Kayer left high school without graduating and joined the Navy. He was discharged from the Navy a year later due to "severe" mental "impairment." He began drinking heavily when he was about twenty-one and became severely addicted to alcohol. He became a compulsive gambler sometime in his twenties. His gambling addiction persisted unabated thereafter.

Kayer suffered the emotional highs and lows typical of bipolar disease. He voluntarily checked himself into VA hospitals in 1983 and 1989. At the VA hospital in 1989, he was given a prescription for lithium, a standard medication for bipolar disease. In 1990 as an outpatient, he was given a

provisional diagnosis of "Personality Disorder/Bipolar." In 1990, Kayer stated that until he was diagnosed and given lithium at the VA hospital in 1989, he had "no idea what was wrong with him."

Kayer had an extensive family history of mental disease. His father was an alcoholic and a compulsive gambler. One of his mother's three sisters "heard voices." That sister testified that Kayer had told her that he heard voices, too. The other two sisters were alcoholics and bipolar. His mother's one brother had mental problems. One of his cousins was bipolar and underwent electroshock therapy.

The evidence presented to the PCR court established the statutory mitigating circumstance of mental impairment under Ariz. Rev. Stat. § 13-703(G)(1). The evidence also established a causal connection between Kayer's mental impairment and the crime. Dr. Sucher testified that at the time of the crime Kayer "had untreated alcoholism and untreated pathological gambling." Dr. Morenz testified that at the time of the crime, Kayer "was having problems with bipolar disorder symptoms . . . , he was having difficulties with out of control pathological gambling and he had difficulty with extensive alcohol abuse." Kayer's near-fatal heart attack, at essentially the same age as his father's fatal heart attack, six weeks before the murder was "another important source of emotional distress that was likely exacerbating all of his other problems."

We must decide whether "it was objectively unreasonable [for the state PCR court] to conclude there was no reasonable probability the sentence would have been different if the sentencing judge . . . had heard the significant mitigation evidence that [Kayer's] counsel neither uncovered nor

presented." *Porter v. McCollum*, 558 U.S. 30, 31 (2009) (per curiam) (stating prejudice standard for ineffective assistance of counsel in an AEDPA case). "We do not require a defendant to show 'that counsel's deficient conduct more likely than not altered the outcome' of his penalty proceeding, but rather that he establish 'a probability sufficient to undermine confidence in [that] outcome.'" *Id.* at 44 (alteration in original) (quoting *Strickland*, 466 U.S. at 693–94).

The State argues that we must accord special deference to the PCR court's holding that Kayer suffered no prejudice because the judge who presided over the PCR proceedings was also the original sentencing judge. The State is incorrect. We assess prejudice independent of the particular judge or judges, as made clear by the Supreme Court in *Strickland*:

> The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision. It should not depend on the idiosyncracies of the particular decisionmaker, such as unusual propensities toward harshness or leniency.

466 U.S. at 695. A post-conviction court must assess whether there is a reasonable possibility that

> the sentencer—including an appellate court, to the extent it independently reweighs the

evidence—would have concluded that the balance of the aggravating and mitigating factors did not warrant death.

*Id.*

"[T]he test for prejudice is an objective one." *White v. Ryan*, 895 F.3d 641, 670 (9th Cir. 2018). In *White*, we faulted the prejudice determination by the PCR court because that "court determined whether *it* would have imposed a death penalty if it had considered the mitigation evidence that [defendant] failed to present [at the penalty phase]." *Id.* (emphasis in original). We further faulted it for failing to take into account the fact that the Arizona Supreme Court was required to independently weigh the aggravating and mitigating circumstances: "The PCR court erred by . . . fail[ing] to consider the probability of a different outcome in the Arizona Supreme Court." *Id.* at 671. *See also Mann v. Ryan*, 828 F.3d 1143, 1167 (9th Cir. 2016) (en banc) (Thomas, C.J., concurring and dissenting) ("[T]he post-conviction court was not excused from its obligation to apply *Strickland* because the same judge presided over both [the defendant's] trial and post-conviction proceeding, and that judge concluded that the newly introduced evidence would not have changed *his* mind." (emphasis in original)).

For a number of reasons, we conclude that the addition of the statutory mitigating circumstance of mental impairment could have changed the outcome of the sentencing proceeding. In the words of the Supreme Court, the addition of this mitigating circumstance created a "reasonable probability the sentence would have been different," *Porter*, 558 U.S. at 31, "sufficient to undermine confidence in the outcome," *id.* at 44 (quoting *Strickland*, 466 U.S. at 693–94),

and it was unreasonable for the state court to conclude otherwise.

First, there was a substantial difference between the evidence submitted at sentencing and the evidence later submitted to the PCR court. In the sentencing court, there was evidence supporting two statutory aggravating circumstances and one weak non-statutory mitigating circumstance. In the PCR court, there were the same two statutory aggravators. But now there was an additional mitigator—for the first time, the statutory mitigator of mental impairment—where previously there had only been one weak non-statutory mitigator.

Second, Kayer's mental impairment had a direct causal relationship to the crime, and would have been given substantial weight at sentencing. In *McKinney v. Ryan*, 813 F.3d 798 (9th Cir. 2015) (en banc), we held that the Arizona Supreme Court had for many years violated *Eddings v. Oklahoma*, 455 U.S. 104 (1982), by refusing, as a matter of law, to give any weight to would-be mitigating circumstances such as mental impairment unless they had a "causal nexus" to the crime of conviction. In *State v. Anderson*, 111 P.3d 369 (Ariz. 2005), the Arizona Supreme Court finally abandoned the causal nexus test.

In post-*Anderson* cases, Arizona courts have considered a broad range of mitigating circumstances. Mitigating circumstances that are causally connected to the crime have been given greater weight than circumstances with no causal nexus. The Arizona Supreme Court wrote in 2006, "We do not require that a nexus between the mitigating factors and the crime be established before we consider the mitigation evidence [but] the failure to establish such a causal

connection may be considered in assessing the quality and strength of the mitigation evidence." *State v. Newell*, 132 P.3d 833, 849 (Ariz. 2006); *see also*, *e.g.*, *State v. Velazquez*, 166 P.3d 91, 106 (Ariz. 2007) ("This mitigating circumstance [of drug and alcohol abuse] was proven by a preponderance of the evidence, but Velazquez did not establish that he was under the influence of drugs or alcohol at the time of the murder."); *State v. Pandeli*, 161 P.3d 557, 575 (Ariz. 2007) ("Pandeli's difficult childhood and extensive sexual abuse, while compelling, are not causally connected to the crime. . . . We do not give this mitigating evidence significant weight.").

Kayer's mental impairment under Ariz. Rev. Stat. § 13-703(G)(1) was causally connected to the crime and would therefore have been given substantial weight. The testimony of Drs. Sucher and Morenz made abundantly clear the causal connection between Kayer's mental problems and the crime. Dr. Sucher specifically referred to Kayer's "untreated alcoholism and untreated pathological gambling" at the time of the crime. Indeed, Kayer had been drinking heavily on the day of the killing, and Kayer killed the victim in order to obtain funds to continue gambling. Dr. Morenz specifically connected the crime to Kayer's "problems with bipolar disorder symptoms," his difficulties with "out of control pathological gambling" and "extensive alcohol abuse," and his "heart attack . . . suffered a few weeks before the murder." Keith Rohman, the mitigation expert who testified in the PCR court, connected these factors to the crime, characterizing them as a "perfect storm."

Third, the aggravating circumstances supporting imposition of the death sentence were not overwhelming. The sentencing judge had specifically rejected the

prosecution's argument for the aggravating circumstance that Haas had not been killed in "an especially heinous, cruel or depraved manner" under Ariz. Rev. Stat. § 13-703(F)(6). Further, one of the two aggravating circumstances found by the Arizona Supreme Court was relatively weak. The "serious crime" of which Kayer had previously been convicted was first degree burglary, one of the less serious crimes specified in Ariz. Rev. Stat. § 13-703(H). Indeed, all of the prior crimes of which Kayer had been convicted were property crimes. He had never been charged with, let alone convicted of, a crime in which he had physically harmed anyone. *See State v. Hyde*, 921 P.2d 655, 687 (Ariz. 1996) ("We . . . find that defendant's non-violent past is a non-statutory mitigating circumstance.").

Fourth, a comparison to other Arizona cases shows that there is a reasonable probability that Kayer would not have been sentenced to death if the mitigating evidence presented to the PCR court had been presented to the sentencing court. Cases in which the Arizona Supreme Court has imposed the death penalty typically involve extreme behavior by the defendant. Kayer's case is unlike these cases. For example, in *State v. Cruz*, 672 P.2d 470 (Ariz. 1983), defendant and two accomplices robbed a married couple and the wife's mother. They bound the victims together on a bed, gagged them, and shot all three in the head. They cut the throat of one of the three victims. In *State v. Chaney*, 686 P.2d 1265 (Ariz. 1984), the defendant fired at least thirty shots with a high-powered automatic rifle at a deputy sheriff while he sat in a vehicle. One shot almost severed the deputy's arm. Another shot was fired at such close range that it left powder burns on his body. In *State v. Fisher*, 686 P.2d 750 (Ariz. 1984), the defendant, in order to keep $500 in rent money he had collected for the seventy-three-year-old victim, shattered

her skull with three blows with a claw hammer. In *State v. Roscoe*, 700 P.2d 1312 (Ariz. 1984), the defendant kidnapped the victim, raped her vaginally and orally, strangled her, and left her body in the desert.

Several cases in which the Arizona Supreme Court has reversed a death penalty imposed by the trial court are similar to Kayer's case. For example, in *State v. Stevens*, 764 P.2d 724 (Ariz. 1988), the defendant robbed two people, shooting and killing one of them. An aggravating circumstance was killing for pecuniary gain. A mitigating circumstance was mental impairment resulting from drug use. On de novo review, the Arizona Supreme Court imposed a life sentence. In *State v. Rockwell*, 775 P.2d 1069 (Ariz. 1989), defendant stole money from the cash register at a truck stop and killed an employee by shooting him in the back of the head. An aggravating circumstance was killing for pecuniary gain. A mitigating circumstance was a motorcycle accident when the defendant was seventeen-years-old, causing "violent and unpredictable behavior." *Id.* at 1079. On de novo review, the Arizona Supreme Court imposed a life sentence.

The Arizona Supreme Court case most closely on point is *State v. Brookover*, 601 P.2d 1322 (Ariz. 1979). Defendant Brookover had agreed to buy 750 pounds of marijuana from the victim. When the marijuana was delivered, Brookover shot the victim in order to avoid paying for it. "The victim fell to the floor moaning and asked the defendant what he had done. The defendant said 'Don't worry . . . it will be over soon' and shot him once more in the back," killing him. *Id.* at 1323. As in Kayer's case, the prosecutor had argued for the statutory aggravator that the murder had been committed in "an especially heinous, cruel or depraved manner," but the Court rejected the argument. *Id*. at 1325. An aggravating

circumstance was that Brookover had previously been convicted of an offense "for which . . . a sentence of life imprisonment or death was imposable." *Id.* at 1323. The one mitigating circumstance was mental impairment. The Arizona Supreme Court set aside the death penalty that had been imposed by the trial court:

> We believe that the defendant's mental condition was not only a mitigating factor, but a major and contributing cause of his conduct which was "sufficiently substantial" to outweigh the aggravating factor of defendant's prior conviction. *Under the circumstances, leniency is mandated.*

*Id.* at 1326 (emphasis added).

The parallels between *Brookover* and Kayer's case are striking. In neither case was the killing committed in "an especially heinous, cruel or depraved manner." In both cases, the one mitigating circumstance was the statutory mitigator of mental impairment. In both cases, the killings were for pecuniary gain. In 1979, pecuniary gain had not yet been applied as a statutory mitigator beyond killings for hire, but a year later the Arizona Supreme Court recognized that the mitigator covered any killing for pecuniary gain. *See State v. Clark*, 616 P.2d 888, 896 (Ariz. 1980); *State v. Schad*, 788 P.2d 1162, 1170–71 (Ariz. 1989) (applying *Clark* to a murder that took place in 1978, a year before *Brookover*: "*Clark* . . . merely recognized the pre-existing scope of present law."). Finally, in both cases, there was a statutory aggravator for prior conviction of a serious offense. However, when Brookover was sentenced, the statutory aggravator required that the conviction have been for a crime

for which the death penalty or life imprisonment could be
imposed. In Kayer's case, the statutory aggravator required
less. It required only a conviction for a "serious crime,"
which in Kayer's case was first degree burglary. On de novo
review of the evidence and sentence, the Arizona Supreme
Court sentenced Brookover to life imprisonment rather than
death. The Court held that leniency was "mandated."
*Brookover*, 601 P.2d at 1326.

In determining prejudice, we need not go so far as
*Brookover*. We need not decide that leniency was
"mandated" and that the state PCR court was unreasonable in
concluding otherwise. We need only decide whether "it was
objectively unreasonable" for the state court to conclude that
there was "no reasonable probability" that Kayer's sentence
would have been different if Kayer's attorneys had presented
to the sentencing court the mitigating evidence later presented
to the PCR court. *Porter*, 558 U.S. at 31. In light of the
foregoing, and particularly in light of the Arizona Supreme
Court's decision in *Brookover*, we hold that there is a
reasonable probability Kayer's sentence would have been less
than death, and that the state PCR court was unreasonable in
concluding otherwise.

### (iii)  Disagreement with the Dissent

Our dissenting colleague concludes that we have not
given sufficient deference to the decisions of the Arizona
state court in this case. We recognize, as does our dissenting
colleague, that the standard under AEDPA is "highly
deferential" and "difficult to meet." *Harrington v. Richter*,
562 U.S. 86, 102, 105 (2011) (citations omitted). The
standard is indeed high. As stated by the Supreme Court, the
precise standard in an ineffective assistance of counsel case

is that in order to set aside a state-court death sentence based on new evidence, we must hold that the new evidence created a "reasonable probability the sentence would have been different," and that the state court unreasonably determined otherwise. *Porter*, 558 U.S. at 31.

Our colleague makes two related points. We respectfully disagree with both of them.

First, our colleague contends that the Supreme Court's decision in *Woodford v. Visciotti*, 537 U.S. 19 (2002) (per curiam), effectively determines the outcome in this case. *Visciotti* cannot bear the weight our colleague places on it.

In *Visciotti*, defense counsel failed to perform an adequate penalty-phase investigation. On state habeas, extensive new mitigation evidence that defense counsel had not identified was presented to a referee appointed by the California Supreme Court. That Court engaged in a detailed analysis of the new evidence and concluded that the failure to present that evidence at sentencing did not prejudice *Visciotti*. *In re Visciotti*, 926 P.2d 987 (Cal. 1996). Our court held that the California Supreme Court had unreasonably concluded that the new evidence did not establish a "reasonable probability" of a different result at sentencing. *Visciotti v. Woodford*, 288 F.3d 1097, 1117–19 (9th Cir. 2002). The Supreme Court reversed, emphasizing the care with which the California Supreme Court had analyzed the new evidence and holding that the Court was not "objectively unreasonable" in finding no prejudice.

The facts in the two cases are similar, though, as our colleague recognizes, they were somewhat less favorable to Visciotti than they are to Kayer. But the cases arise in very

different contexts. First, and most obviously, in our case we ask what an Arizona rather than a California sentencing court would have done. This is important because the statutes, procedures, and case law in the two jurisdictions are different. Second, in *Visciotti* there was a reasoned decision by the California Supreme Court, but in our case there was no reasoned decision by the Arizona Supreme Court. This is critically important, given the Arizona capital sentencing scheme at the time. Under Arizona law, the Arizona Supreme Court was the ultimate sentencing court. On mandatory direct appeal from a sentencing court, the Arizona Supreme Court reviewed the evidence de novo and decided independently whether to impose the death penalty. *See*, *e.g.*, *Kayer*, 984 P.2d at 40–41.

In determining prejudice, therefore, we look to how the Arizona Supreme Court would have assessed the new evidence presented to the PCR court if that evidence had been presented on direct appeal. We do not know how the Arizona Supreme Court in Kayer's case would have assessed on direct appeal the evidence presented to the PCR court because that evidence was not then in the record. Nor do we know how the Arizona Supreme Court would have assessed that evidence on collateral review because the Court denied without explanation Kayer's petition for review. The best we can do is look at de novo sentencing decisions by the Arizona Supreme Court in comparable cases. Those cases are the best evidence of what the Court would have done if the new mitigating evidence had been presented in Kayer's direct appeal.

Second, our colleague contends that we have not given appropriate deference to the decision of the state PCR judge. The PCR judge was also the sentencing judge. However,

"[t]he assessment of prejudice . . . should not depend on the idiosyncracies of the particular decisionmaker[.]" *Strickland*, 466 U.S. at 695. "[T]he test for prejudice is an objective one." *White v. Ryan*, 895 F.3d 641, 670 (9th Cir. 2018). The question is thus not what the PCR judge would have done in light of the new evidence. The question, rather, is what the ultimate sentencing authority, the Arizona Supreme Court, would have done. We therefore must ask whether the PCR judge was unreasonable in concluding that there was no "reasonable probability" of a different result in the Arizona Supreme Court if that Court had had before it the evidence presented to the PCR court.

Unless we are to engage in sheer guesswork, the only way to determine what the Arizona Supreme Court would have done in light of Kayer's new evidence is to look at what that Court has done in comparable cases. We describe, above, several decisions of that Court. One of them, *Brookover*, is on all fours with Kayer's case. The only difference is that one of the statutory aggravators was stronger in *Brookover*. The Arizona Supreme Court held in *Brookover* that leniency was "mandated."

Our colleague refuses to acknowledge the striking parallels between *Brookover* and Kayer's case, writing only: "The majority's reliance on *State v. Brookover*, 601 P.2d 1322 (Ariz. 1979), *a forty-year-old case*, ignores what the state court did in this case." Diss. Op. at 75 (emphasis added). Our colleague maintains that we can safely ignore *Brookover* because of its age ("a forty-year-old case").

Our colleague misses the fact that when the Arizona Supreme Court reviewed Kayer's sentence de novo on direct appeal, *Brookover* had been decided only twenty (not forty)

years earlier. The Arizona Supreme Court in capital cases routinely cites and treats as binding precedent its own decisions from twenty years (and more) before. *See, e.g.*, *State v. Hedlund*, 431 P.3d 181, 190 (Ariz. 2018) (discussing and distinguishing *State v. Graham*, 660 P.2d 460 (Ariz. 1983); *State v. Trostle*, 951 P.2d 869, 885 (Ariz. 1997) (discussing and relying on *State v. Richmond*, 560 P.2d 41, 52–53 (Ariz. 1976)). *See also State v. Stuard*, 863 P.2d 881, 902 (Ariz. 1993) (citing, inter alia, *State v. Doss*, 568 P.2d 1054, 1060 (Ariz. 1977), and writing, "Leniency is therefore required"). Nothing in the practice of the Arizona Supreme Court suggests that when it sentenced Kayer de novo in 1999, it would have treated as less-than-binding a twenty-year-old precedent. In that precedent— *Brookover*—the Arizona Supreme Court had held, on facts less favorable to the defendant than those in Kayer's case, that a non-capital sentence was "mandated." Given *Brookover*'s holding that "leniency" was "mandated," it was unreasonable for the PCR judge to conclude that in Kayer's case there was no "reasonable probability" that the Arizona Supreme Court on direct appeal would have imposed a non-capital sentence.

## IV. Other Certified Claims

Kayer asserts two additional certified claims with which we may deal fairly quickly.

### A. Continuance

Kayer argues that the sentencing court violated his Sixth Amendment rights by acceding to his objection to a continuation of his sentencing hearing. He argues that the court should have disregarded his objection and instead granted his attorneys' request for a continuance. In light of

our holding, above, that the sentencing court unreasonably concluded that Kayer's attorneys performed effectively and, in the alternative, if they performed ineffectively, that Kayer suffered no prejudice, we need not reach the question whether the court acted properly in denying the continuance.

## B. *Martinez*

Kayer seeks to revive several procedurally barred guilt-phase ineffective assistance of counsel claims by showing cause and prejudice under *Martinez v. Ryan*, 566 U.S. 1 (2012). Post-conviction counsel's ineffectiveness in failing to raise a meritorious ineffective assistance of counsel claim may constitute "cause" sufficient to overcome a procedural bar. *Id.* at 17. To prevail, the petitioner must show that (1) post-conviction counsel performed deficiently, (2) effective counsel might have changed the result of the post-conviction proceedings, and (3) the underlying ineffectiveness claim was substantial. *Pizzuto v. Ramirez*, 783 F.3d 1171, 1178–79 (9th Cir. 2015). An evidentiary hearing is appropriate if "such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Runningeagle v. Ryan*, 825 F.3d 970, 990 (9th Cir. 2016) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007)).

Kayer sought to revive several claims in the district court and seeks to revive them here. The district court held that none of the claims was substantial in the sense necessary to support a finding of cause and prejudice under *Martinez*. Upon review of the evidence, we agree with the district court.

### V.  Uncertified Claims

Kayer seeks certification of two claims that the district court declined to certify.  We also decline to certify these claims.

### Conclusion

We reverse the decision of the district court with respect to ineffective assistance of counsel at the penalty phase.  We otherwise affirm.

We remand to the district court with instructions to grant the writ with respect to the penalty phase unless the State, within a reasonable period, grants Kayer a rehearing with respect to the penalty or vacates the sentence of death and imposes a lesser sentence consistent with the law.

**REVERSED in part, AFFIRMED in part, and REMANDED with instructions.**

OWENS, Circuit Judge, concurring in part and dissenting in part:

While I agree with much of the majority's decision, I part ways as to its conclusion that we must reverse Kayer's death sentence.  I cannot say that the Arizona PCR court acted unreasonably regarding prejudice in light of the aggravating and mitigating circumstances in this case.

The AEDPA standard is "highly deferential" and "difficult to meet." *Harrington v. Richter*, 562 U.S. 86, 102,

105 (2011) (citations omitted). The petitioner must show that the state court's decision was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103. In other words, AEDPA "demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam).

The majority concludes that the aggravating factors supporting imposition of Kayer's death sentence were "not overwhelming." Majority Opinion 62. It focuses on the prior serious offense aggravating factor as being "relatively weak," Majority Opinion 57, 63, but overlooks the strength of the pecuniary gain aggravating factor. For that aggravator, the defendant must have a financial "motive, cause, or impetus" for the murder. *State v. Kayer*, 984 P.2d 31, 41 (Ariz. 1999) (citation omitted). There is no dispute that Kayer had a financial motive for killing Haas, doing so for a mere few hundred dollars' worth of cash and other items. *See State v. Soto-Fong*, 928 P.2d 610, 632 (Ariz. 1996) ("Pecuniary gain does not focus on whether the defendants were effective or thorough robbers, but on whether their motive was financial gain.").

Moreover, the crime here was brutal, even if it did not rise to the level of "especially heinous, cruel or depraved." Kayer decided to rob and kill Haas, and the next day shot Haas in the head at point-blank range during a remote bathroom stop on their drive home from a gambling trip. Kayer took Haas's wallet, watch, and jewelry. Kayer left Haas in the bushes and drove away, but turned around upon realizing he had forgotten to take Haas's keys to loot his house. Kayer

returned to the murder scene, retrieved the keys, and shot Haas in the head again because he did not appear to be dead.

These facts are remarkably similar to *Visciotti*, where the U.S. Supreme Court reversed our grant of habeas relief. 537 U.S. at 20. There, in a preplanned armed robbery, the defendant and his co-worker shot two co-workers as they all drove to a party and made a remote bathroom stop (one victim died and one survived). *Id*. The defendant was sentenced to death. *Id*. At the PCR stage, the California Supreme Court determined that the defendant had not been prejudiced by his counsel's failure to introduce mitigating evidence about his background. *Id*. at 21. In particular, the California Supreme Court concluded that the mitigating evidence was outweighed by "the circumstances of the crime (a cold-blooded execution-style killing of one victim and attempted execution-style killing of another, both during the course of a preplanned armed robbery) coupled with the aggravating evidence of prior offenses (the knifing of one man, and the stabbing of a pregnant woman as she lay in bed trying to protect her unborn baby)." *Id*. at 26. We held that decision was objectively unreasonable and granted habeas relief. *Id*. at 21–22.

The U.S. Supreme Court reversed, stating that we had impermissibly "substituted [our] own judgment for that of the state court, in contravention of" AEDPA. *Id*. at 25. Likewise, here, the majority impermissibly substitutes its own judgment that Kayer was prejudiced. Granted, the prior offenses in *Visciotti* were more serious than Kayer's prior burglary conviction. However, the "federal habeas scheme leaves primary responsibility with the state courts for these judgments, and authorizes federal-court intervention only when a state-court decision is objectively unreasonable. It is

not that here." *Id*. at 27. The majority contends that *Visciotti* is different because it took place in California, involved a PCR decision by the state supreme court, and Arizona had a distinct capital sentencing scheme at the time. Majority Opinion 67–68. But those differences do not excuse AEDPA deference to the Arizona PCR court's decision here. *See Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (reversing Ninth Circuit in an Arizona capital case, and noting that "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold").

Further, Kayer's mitigation—mental illness, and gambling and alcohol addiction—was hardly overwhelming; we have denied habeas relief based on far worse mitigating facts than this one. *See, e.g.*, *Apelt v. Ryan*, 878 F.3d 800, 815–16 (9th Cir. 2017) (denying habeas relief even though trial counsel failed to uncover mitigating evidence that the defendant grew up very poor, had an alcoholic and violent father who beat his children with an iron rod, was raped twice as a child, and suffered from mental illness); *Cain v. Chappell*, 870 F.3d 1003, 1021 (9th Cir. 2017) (denying habeas relief despite new mitigating evidence that the defendant was severely beaten and punished by his stepmother, had an untreated childhood head injury, and had learning disabilities).

Here, we have an undisputedly strong aggravating factor, an arguably weak one, and some mitigation, all of which the Arizona PCR court reviewed. The majority's reliance on *State v. Brookover*, 601 P.2d 1322 (Ariz. 1979), a forty-year-old case, ignores what the state court did in this case. The U.S. Supreme Court has warned us again and again not to

intrude on state court death sentences unless "so lacking in justification" as to give rise to constitutional error "beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. I fear that we have done so again, so I respectfully dissent.